UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TOMMY DAVIS,

                              Petitioner,

           v.                                              9:24-CV-0046
                                                           (DNH)

THOMAS MCGUINESS, Superintendent,
Shawangunk Correctional Facility,

                              Respondent.

---

APPEARANCES:                                    OF COUNSEL:

TOMMY DAVIS
Petitioner, pro se[1]
12-B-2284
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

HON. LETITIA JAMES                              PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent                         Ass't Attorney General
New York State Attorney General
28 Liberty Street
New York, NY 10005

DAVID N. HURD
United States District Judge


**DECISION and ORDER**

**I.     INTRODUCTION**

     Pro se petitioner Tommy Davis ("Davis" or "Petitioner") seeks federal habeas corpus

relief pursuant to 28 U.S.C. § 2254 to vacate his conviction, in Onondaga County Court, for

---

[1] *See* Dkt. Nos. 7, 9

1

several crimes connected to shooting at a group of teenagers in the early morning hours of October 7, 2010, in Syracuse, New York. Dkt. No. 1 ("Petition") ("Pet."); Dkt. No. 1-1 (Petitioner's Memorandum of Law) ("Pet. Memo."). Respondent ("McGuiness" or "Respondent") was directed to answer the petition. Dkt. No. 4. Respondent opposed the petition. Dkt. No. 16 (Answer); Dkt. No. 16-1 (Memorandum of Law in Opposition) ("Resp. Memo."); and Dkt. No. 17 through 17-7 (State Court Records).[2]

For the reasons that follow, Davis's habeas petition is denied and dismissed.

## II.    RELEVANT BACKGROUND

### A.  Indictment

In December 2010, an Onondaga County grand jury returned an Indictment charging Petitioner with two counts of murder in the second degree, criminal possession of a weapon in the second degree, reckless endangerment in the first degree, and endangering the welfare of a child. Dkt. No. 17-4 at 67-69.[3] Thereafter, in October 2011, an Onondaga County grand jury returned a Superseding Indictment charging Petitioner with murder in the second degree, criminal sale of a controlled substance in the fifth degree, endangering the welfare of a child, attempted murder in the second degree, and criminal possession of a weapon in the second degree. *Id*. at 70-72.

The Superseding Indictment alleged that, on or about October 7, 2010, Petitioner intentionally caused the death of Kiwan Rush ("Rush") by shooting him in the chest. *Id*. Petitioner was also charged with knowingly and unlawfully selling a controlled substance (PCP) to Rush.

---

[2] Petitioner was afforded the opportunity to file a reply. Dkt. Nos. 18, 21. Petitioner did not file a traverse.

[3] Citations to the submissions refer to the pagination generated by CM/ECF, the Court's electronic filing system.

*Id*. Petitioner was also charged with attempting to cause the death of Tyron West ("West") and possessing a loaded firearm.  Dkt. No. 17-4 at 67-69.

On December 22, 2010, Petitioner was arraigned and entered a plea of not guilty.  Dkt. No. 17-6 at 8.

**B.  Trial**

A jury trial was held in Onondaga County Court in May 2012.  Dkt. No. 17-6 at 256.  The People called several witnesses to testify, including West, Jaquan Jones ("J. Jones"), and Sherron Jones ("S. Jones"), the three teenagers who were with Rush at the time of the shooting on October 7, 2010.

West testified that, on October 6, 2010, he "spent the day getting high" smoking ciga-rettes containing PCP and marijuana*. Id.* at 749-751.  Between 6:00 p.m. and 7:00 p.m., West and Rush went to Petitioner's grandmother's house at 1212 West Colvin Street.  *Id*. at 716-717, 721, 753.  Petitioner gave West and Rush some cigarettes containing PCP.  *Id.* at 717-719.  West and Rush smoked the cigarettes.  Dkt. No. 17-6 at 720, 722.  West and Rush then went to an abandoned building to "hang out" with J. Jones and S. Jones.  *Id*. at 720-724, 746.

West testified that he became "trigger happy" and left the abandoned building to retrieve a shotgun from behind a house on South Avenue.  Dkt. No. 17-6 at 724-727, 758.  West ex-plained that he had stashed the shotgun there "sometime before."  *Id*.  At approximately 11:00 p.m., West walked back to Petitioner's grandmother's house at 1212 West Colvin Street with the shotgun hidden in his sleeve and "shot at" the house.  *Id*.  When asked why he did so, he testified: because "I ain't like him, I guess."  *Id*. at 724-727.  After he fired the shots at Peti-tioner's house, West ran back to the abandoned building, still carrying the shotgun. Dkt. No.

17-6 at 728-729.  Rush, S. Jones, and J. Jones were all still hanging out at the building and West told them what he had done.  *Id.* at 728-729.

Fifteen to twenty minutes later, the group left the abandoned building and proceeded to Eastman Avenue.  Dkt. No. 17-6 at 730.  As they were standing in the middle of Eastman Avenue, "somebody started shooting" from the direction of Eastman and May.  *Id*. at 731-732. West testified that the shots were coming "his" way and "hitting the ground."  *Id*. at 735.  West testified that he started walking towards the person who was shooting and shot back at him with his shotgun.  *Id*. at 732.  The person returned fire.  Dkt. No. 17-6 at 732.  West identified the person who shot at him and Rush as Petitioner.  *Id*. at 732-733.

Petitioner got into a car and continued to fire at the group as the car pulled away.  *Id*. at 733.  West dumped the shotgun behind a house on Eastman, "grabbed" Rush—who had been hit and was lying in the street—and "went to somebody's house on Eastman."  Dkt. No. 17-6 at 733-734.  West initially tried to help Rush, but left before the police arrived because he was "scared."  *Id*. at 734-735.

West testified that, on October 29, 2010, he gave a statement to the Syracuse Police.[4] Dkt. No. 17-6 at 736-737.  West "learned" he would be testifying at trial pursuant to a "deal" that provided that he would not be charged for possessing a weapon or shooting the shotgun at Petitioner's house.  Dkt. No. 17-6 at 737-738, 775.

On cross-examination, West was asked about a letter dated March 1, 2012.[5]  Dkt. No. 17-6 at 769-770.  This handwritten letter, addressed to Tommy Davis and dated March 1, 2012, stated, "this is Woody/Tyron West. I wanted to let you know that nobody going take the stand

---

[4]  The statement was marked as an exhibit for identification but was not admitted into evidence.  Dkt. No. 17-6 at 262.

[5]  The letter itself is part of the record and is attached as Exhibit A to this opinion.

on you. I'm trying to take the statement back I wrote on you." Dkt. No. 17 at 78. The letter's author stated that he/she was "persuaded to say you shot my boy Kiwan. I was told no charges would be press on me if I say I saw you shoot him." *Id*.

West denied writing this letter. *Id.* West admitted that he was previously incarcerated at Lakie Cottage, located in Lincolndale, New York, and that he used the nickname "Woody." *Id*. Petitioner's counsel presented West with a copy of an envelope and asked, "[i]s that your handwriting where it says Tyron West on the corner?" *Id*. at 770. West stated, "[t]hat's my name, but it ain't my handwriting." Dkt. No. 17-6 at 770. Petitioner's counsel asked, "[a]nd that Lincolndale, New York, that's somebody's else's handwriting as well?" *Id*. West responded, "that's where I was at, yeah." *Id.* Petitioner's counsel then asked, "Okay. So you're saying you did not write this letter on March 1st, 2012?" Id. West responded, "no." *Id.* Petitioner's counsel then asked, "[s]omebody else knew where you were, wrote your name, wrote the letter and set it off?" Dkt. No. 17-6 at 770. West responded, "[a] lot of people knew where I was, yeah." *Id*.

J. Jones testified that he was "hanging out" with his brother, Rush, and West (who he referred to as "Woody"). Dkt. No. 17-7 at 75, 79. J. Jones testified that the group was "in the middle of Eastman" when someone "started shooting." *Id*. at 91. J. Jones identified Petitioner as the shooter and noted that he was able to see Petitioner because he was standing under the street light. *Id*. J. Jones testified that after Petitioner started shooting, everyone ran. *Id*. at 92. J. Jones ran to an apartment and waited "until the shots stopped." Dkt. No. 17-7 at 92. When J. Jones "came back out, "the police were in the middle of the street." *Id*. At the time, J. Jones did not know what happened to Rush or his brother. *Id*.

S. Jones testified he was with his brother, Rush (who he referred to as "Kiki"), and West (who he referred to as "Woody") on October 6, 2010. Dkt. No. 17-7 at 186-188. The group

5

encountered Petitioner on Rockland and Petitioner asked "did [they] know about" cigarettes dipped with PCP. *Id*. At that point, S. Jones turned and walked away. *Id*. at 189. Later that evening, around 9:00 p.m., S. Jones and his brother met up with Woody and Kiki near West Colvin. *Id*. at 192. S. Jones saw Petitioner give Kiki a cigarette while in front of Petitioner's house near the intersection of West Colvin and South Avenue. Dkt. No. 17-7 at 192.

S. Jones testified that, at 10:00 p.m., the group went to an abandoned house on Eastman. *Id.* at 195-196. While they were "hanging out" in the house, Woody left for "about ten minutes." *Id.* at 197. When he returned, he had a shotgun. *Id*. at 200. S. Jones and his brother "grabbed a bike" that was behind the house and brought the bike to the street. Dkt. No. 17-7 at 200. While they were standing with Kiki and Woody, in the middle of Eastman, attempting to fix the bike, "gunshots" were fired from the corner of May Avenue and Eastman. *Id.* at 198-199. S. Jones testified that the shots were "towards" them but that he could not see the person who fired the shots. *Id*. at 199. S. Jones saw Kiki "on the ground" and turned and ran. *Id*. at 199, 202.

The People also called Jaquan Gilbert ("Gilbert") as a witness. Gilbert testified that he was on Eastman Avenue at 4:00 a.m. on October 7, 2010. Dkt. No. 17-7 at 175-176. Gilbert saw his cousin, Rush, in an ambulance. *Id*. at 176. Gilbert was asked if he knew a person with the nickname of "Boo." *Id.* Gilbert said that he did but, when asked if he saw him in court that day, he responded, "I can't recall" and "I wouldn't know." *Id.* Gilbert also denied knowing a person by the name of Tommy Davis. Dkt. No. 17-7 at 177.

The medical examiner testified that Rush died from a gunshot wound to his chest. Dkt. No. 17-7 at 274.

On May 23, 2012, at the conclusion of the trial, the jury found Petitioner guilty of murder in the second degree, endangering the welfare of a child, criminal possession of a weapon in the second degree, and attempted murder in the second degree as to West. Dkt. No. 17-4 at 66, 368, 606-607.

### C. Motion to Set Aside Verdict and Sentencing

On July 10, 2012, Petitioner filed a counseled motion to set aside the verdict pursuant to New York Criminal Procedure ("CPL") § 330.30.[6]  Dkt. No. 17-1 at 109-143.  As relevant here, Petitioner's CPL § 330.30 motion claimed that: (1) West's testimony was insufficient as a matter of law to establish murder in the second degree; (2) insufficient evidence existed to convict Petitioner of attempted murder in the second degree; (3) newly discovered/*Brady* evidence, including transportation fees and arrangements offered to West, was not disclosed; (4) the sentences for murder and attempted murder must run concurrently; and (5) new evidence of S. Jones' gang involvement and subsequent shooting was a basis for a new trial.  *Id*. at 108-143, 144-178.  The People opposed the motion.  Dkt. No. 17-1 at 101-107.

On July 18, 2012, the Onondaga County Court denied Petitioner's CPL § 330.30 motion. Dkt. No. 17-1 at 144-178.  First, with respect to the offer of transportation fees/travel arrangements to West, Petitioner's counsel conceded that "at the time of trial there was no transportation arrangements" but argued that the prosecution failed to disclose, prior to trial, that they had made arrangements for plane fare "out of state" for West.  *Id.* at 146.  Counsel noted, "Tyron West may not have wanted to go, but his mother asked for those arrangements to be made, and there was an agreement."  *Id.*  In response, the People noted that while

---

[6] The motion was filed by Attorney Bianco, the attorney who represented Petitioner at trial.

arrangements were made, West "adamantly said he was not going to do this." *Id*. at 149. The court concluded that the information was not *Brady* material. Dkt. No. 17-1 at 149-150.

Second, Petitioner's counsel argued that West's testimony was insufficient and inconsistent. In support, Petitioner's counsel read the contents of the March 2012 letter, which was discussed during West's cross examination, into the record. Dkt. No. 17-1 at 151-152. Petitioner's counsel also advised the court that, after the conviction, the letter was forwarded to a handwriting analyst. *Id.* at 154. The analyst concluded that there were "significant similarities" between West's signature and the letter. *Id*. Therefore, counsel argued that West may have perjured himself. *Id*. Petitioner's counsel also explained that she did not attempt to lay a foundation for the letter to be admitted as evidence due to the court's prior ruling that the People would be permitted to introduce Petitioner's prior felony convictions if he testified at trial. Dkt. No. 17-1 at 153-154. The trial court found West's testimony sufficient and noted that Petitioner's decision "to testify or not testify is ultimately the defendant's." *Id*. at 157.

Third, while Petitioner's counsel argued that "there were two separate instances of shooting" and the testimony established that the shots were directed at a "group of people," the court concluded that "being a bad shot doesn't mean that he is not guilty of an attempted murder." Dkt. No. 17-1 at 158-162. Fourth, with respect to the sentences, the court held that consecutive sentences would be appropriate. *Id.* at 165-166.

Finally, Petitioner's counsel advised the court that, after the verdict, S. Jones was the subject of a shooting with "allegations of gang involvement." *Id*. at 167. Counsel presented the court with "the paperwork from the person accused of shooting him, as well as the newspaper account." *Id.* Therefore, counsel argued that "[t]his type of evidence could she a whole

difference light on the trial." *Id.* The court concluded that S. Jones' alleged gang involvement was "purely speculation." Dkt. No. 17-1 at 171.

On July 19, 2012, the trial court sentenced Davis to an indeterminate prison term of 25 years to life for murder in the second degree and a one-year sentence for endangering the welfare of a child, to run concurrently with that sentence. Dkt. No. 17-1 at 175-176. For the conviction of attempted murder in the second degree, the court imposed a 25-year determinate sentence, with a five-year post-release supervision period, to run consecutively. *Id*. at 176. The court also imposed a 15-year determinate sentence, with a five-year post-release supervision period for the conviction of criminal possession of a weapon in the second degree to run concurrently with the prior sentences. *Id.* at 177.

### D. Motion to Vacate

On May 7, 2018, Petitioner filed a counseled motion to vacate his judgment of conviction pursuant to CPL § 440.10. Dkt. No. 17 at 5-174; Dkt. No. 17-1 at 1-56. Petitioner argued: (1) trial counsel was ineffective because she did not appropriately cross-examine West with the contents of the March 1, 2012 letter and failed to follow up on various investigative leads; (2) actual innocence; (3) newly discovered evidence; and (4) the People violated their *Brady* obligation*. Id.* The People opposed the motion. Dkt. No. 17-1 at 57-99. Petitioner filed a reply. *Id*. at 180-192.

On July 15, 2020, the Onondaga County court denied the motion. Dkt. No. 17-1 at 193-206. The court rejected Petitioner's ineffective assistance of counsel claim, noting that Petitioner's counsel "was thoroughly familiar with the underlying facts of the case, made pertinent motions, delivered appropriate opening and closing statements, raised appropriate objections, cross-examined the prosecution witnesses, and effectively presented a reasonable trial

9

strategy in the face of strong opposing evidence." *Id*. at 198.  With regard to the cross-exami-nation of West, the court noted that petitioner's counsel had cross-examined him regarding the contents of the March 1, 2012 letter and that West denied writing the letter.  *Id*. at 199.  The court further reasoned that counsel's failure to introduce the letter itself was a decision made with "the specific strategy of preventing the jury from hearing about the defendant's prior felony convictions." *Id.*  The court rejected Petitioner's claim that his counsel was ineffective for failing to investigate the gang affiliations of S. Jones noting that that the allegations were speculative and would likely not have resulted in a different outcome.  Dkt. No. 17-1 at 200.

The court found that Petitioner's claims of actual innocence were barred under CPL § 440.10(2)(b) and further, that there was no basis to conclude that Petitioner made a prima facie showing of actual innocence.  Dkt. No. 17-1 at 200-201.

With respect to newly discovered evidence, Petitioner's motion focused on three items: (1) the recovery of the murder weapon three weeks after Petitioner's arrest; (2) the alleged gang affiliation of S. Jones; and (3) an affidavit from Shawndell Everson ("Everson") recounting a jailhouse conversation with Jaquan Gilbert ("Gilbert").  Dkt. No. 17-1 at 202-203.

With respect to the weapon, counsel provided the court with a copy of a January 2016 letter forwarded to Petitioner's prior counsel from the District Attorney's Office.  Dkt. No. 17 at 93.  In the letter, the prosecutor informed counsel that on February 8, 2013, he received a memorandum and documents from the Center For Forensic Sciences ("Center") related to a gun recovered by the Syracuse Police Department on January 26, 2011, in an unrelated case. *Id.*  The prosecutor provided copies of police reports from that case, which involved a search of Dion Dixie ("Dixie").  *Id.*  Dixie told the police that he "found the gun."  *Id.*  On May 4, 2011, Dixie was sentenced after pleading guilty to criminal possession of a weapon.  *Id.*  The

prosecutor enclosed the reports from the Center which indicated that the gun recovered in Dixie's case "fired the projectile that killed Kiwan Rush." Dkt. No. 17 at 93. The prosecutor opined, "I do not believe that this constitutes exculpatory material, but I am providing it to you in an abundance of caution." *Id*. at 93. The prosecutor disclosed that he was "unaware of the information at the time of trial." *Id*.

Petitioner's counsel argued that the evidence would have changed the outcome of the trial. *Id*. at 62. But the court disagreed, noting that the recovery of the murder weapon three weeks after Petitioner's arrest was not exculpatory. Dkt. No. 17-1 at 203. The weapon was not offered into evidence at trial and the People were not aware, at the time of trial, that the gun was used to fatally shoot Rush. *Id.* On the issue of S. Jones' gang affiliation, the court noted that this was addressed in the order denying the § 330.30 motion. Dkt. No. 17-1 at 203. Moreover, the issue was preserved and could be asserted on direct appeal. *Id.* at 203-204.

Finally, Petitioner's counsel presented the court with an affidavit from Everson, who was housed with Gilbert at the Syracuse Justice Center between September 2014 and October 2015. Dkt. No. 17 at 148. In the affidavit, dated December 2017, Everson avers that Gilbert told him Petitioner "had nothing to do with the shooting" and claimed he "tried to get out of testifying" but he was on parole. *Id*. Gilbert told Everson he "never said the guy Boo was the shooter on the stand, because he knew he wasn't the shooter." *Id.* The court ruled that this was not "new evidence" and noted that Everson's affidavit regarding a jailhouse conversation with Gilbert was hearsay and "not compelling enough" to require a new trial. Dkt. No. 17-1 at 204.

Finally, the court rejected Petitioner's *Brady* claim related to an airline ticket/funds to West. Dkt. No. 17-1 at 205. The court noted, "[the] claim[] [was] previously raised in Attorney

11

Bianco's CPL §330.30 motion and addressed by the Court on the record prior to sentencing on July 18, 2012.  As these claims were already adjudicated by this Court, denial of the motion on these grounds is proper under CPL §440.10(3)(b)."  *Id*.  Moreover, the issue was preserved and could be raised on direct appeal.  *Id*.

### E.  Direct Appeal

Petitioner appealed his conviction in a counseled brief to the Appellate Division, Fourth Department.  Dkt. No. 17-4 at 424-495.  There, Petitioner asserted that: (1) the trial evidence was insufficient to establish intent; (2) the trial court erred in imposing consecutive sentences for murder and attempted murder, and (3) the People violated Petitioner's right to a fair trial by failing to disclose evidence pursuant to *Brady*.  *Id*.  The People opposed.  Dkt. No. 17-4 at 505-575.

On October 8, 2021, the Appellate Division rejected Petitioner's argument that the convictions on the murder and attempted murder charge were not supported by legally sufficient evidence.  *People v. Davis*, 155 N.Y.S.3d 516 (App. Div. 4th Dep't 2021).  The Appellate Division also found the imposition of consecutive terms of imprisonment on the murder and attempted murder counts was not illegal.  *Id*.  Finally, the Appellate Division noted, "[d]efendant's remaining contentions do not warrant reversal or modification of the judgment."  *Id*.

Petitioner sought leave to appeal to the New York Court of Appeals, but that application was denied.  Dkt. No. 17-4 at 586.

### F.  Motion to Set Aside Sentence

Thereafter, in February 2023, Petitioner filed a counseled motion to set aside the sentence pursuant to CPL § 440.20 on the grounds that the sentence penalized Petitioner for exercising his right to a jury trial.  Dkt. No. 17-4 at 587-595.  Petitioner claimed that a plea offer

was made "mid-trial" that included a prison sentence of 15 years to life.  *Id*.  The People opposed the motion.  Dkt. No. 17-4 at 618-625.

The Onondaga County court denied the motion, finding that "defendant's allegations are factually and legally insufficient to support a· finding by the Court that the Defendant's sentence should be set aside."  Dkt. No. 17-4 at 627.  The court further noted that there was no evidence of "said offer on the record."  *Id.*  Even assuming the truth of Petitioner's assertion, the court concluded that it did not provide a basis to vacate the sentence.  The court reasoned:

> Upon review of the trial record, it is clear that many witnesses were giving the prosecution difficulty and there was even an identification hearing conducted mid-trial.  It would have been reasonable, at that juncture, for the Court to believe the People's case was not so strong and make an offer to reasonably resolve the case.  ·However, later the People were able to meet their burden and  Defendant was convicted of all but one count by the jury.  After having heard all of the ·evidence in the case, which involved a murder and attempted murder, and after the People having met their burden it is more than reasonable  for the trial court at that point to sentence the Defendant to the maximum sentence on several counts. The maximum sentence after a jury trial in a case of this kind can in no way be seen as vindictive.

Dkt. No. 17-4 at 628-629.

Petitioner sought leave to appeal the denial of the motion but leave was denied.  Dkt. No. 17-5 at 70.

## III.    HABEAS CORPUS PETITION

Petitioner contends that he is entitled to federal habeas relief for the following reasons: (1) legal sufficiency (Ground 1); (2) the People failed to comply with their *Brady* obligations (Ground 2); (3) newly discovered evidence (Ground 3); (4) sentencing claims; (Ground 4); (5) ineffective assistance of counsel (Ground 5); and (6) actual innocence (Ground 6).  Pet. at 8-11.

## IV.    LEGAL STANDARDS

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster,* 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).  The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' "  *Nevada v. Jackson*, 569 U.S. 505, 508-509 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'") (quoting *Richter*, 562 U.S. at 103)).

14

Additionally, AEDPA foreclosed "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007).

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro,* 550 U.S. at 473-74 (quoting § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.,* 790 F.3d 109, 121 (2d Cir. 2015). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. 289, 301 (2013). If there is no adjudication on the merits then the pre-AEDPA de novo standard applies. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

## B.  Exhaustion

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (citing 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the

two adjudicatory institutions."  *Daye v. Att'y Gen. of New York,* 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement.").  Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law.  *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)).

"The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court."  *Daye*, 696 F.2d at 192.  This exhaustion requirement is satisfied if the federal claim has been " 'fairly present[ed]' " to the state court.  *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court."  *Daye*, 696 F.2d at 191.  A petitioner may fairly present the constitutional nature of his claim in the following manner:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye*, 696 F.2d at 194.

### C.  Procedural Bar

It is "well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  *Walker v.*

*Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler,* 558 U.S. 53, 55 (2009)) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991))).  Even if the state court proceeds to consider the merits of an unpreserved claim, its reliance on a procedural ground as one basis for the denial of the claim precludes habeas review.  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternate holding" because "the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.") (emphasis in original).

Procedurally defaulted claims are not subject to habeas review unless a petitioner shows cause for the default and resulting actual prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice, i.e., that he or she is actually innocent. *House v. Bell,* 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Jackson v. Conway,* 763 F.3d 115, 133 (2d Cir. 2014).

To establish cause, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule.  *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).  Prejudice requires a petitioner to show "not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier,* 477 U.S. 478, 494 (1986) (quoting U*nited States v. Frady*, 456 U.S. 154, 170 (1982)) (alteration in original).  If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice.  *See id.* at 496 (referring to the cause and prejudice test "in the conjunctive"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

17

However, courts have recognized an equitable exception to the procedural bar in cases where a petitioner can prove actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence–that was not presented at trial." *Schlup,* 513 U.S. at 324; *see also Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir. 2003).

In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327); *see also Doe v. Menafee,* 391 F.3d 147, 160-62 (2d Cir. 2004). The Supreme Court cautioned, however, that "tenable actual innocence gateway claims are rare[.]" *McQuiggan,* 569 U.S. at 386; *see also House*, 547 U.S. at 538 (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case." (quoting *Schlup,* 513 U.S. at 327)) (internal quotation marks omitted).

"The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggan*, 569 U.S. at 401 (internal quotation marks omitted). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

18

## V.    ANALYSIS

### A.  Legal Sufficiency (Ground 1)

Petitioner claims that the jury was not presented with sufficient evidence to establish the requisite mens rea for intentional murder and depraved indifference.  Pet. Memo. at 13-15.  Petitioner argues, "[a]s to the same victim, a defendant cannot both intend to kill and act with a depraved indifference to human life."  *Id*. at 15.  Respondent answers that the claim is unexhausted, procedurally defaulted, barred from habeas review on an adequate and independent state law ground, and without merit.   Resp. Memo. at 23-27.

### 1. Exhaustion

On direct appeal, Petitioner argued that "as to the same victim, a defendant cannot intend to kill and act with a depraved indifference to human life."  Dkt. No. 17-4 at 462.  Petitioner also argued that there was insufficient evidence that he intended to kill Rush and insufficient evidence to support the conviction for the attempted murder of West.  *Id*. at 465-466.

Respondent urges this claim must be denied as unexhausted and procedurally barred because Petitioner did not argue, on direct appeal, that he has been improperly convicted of both intentional and depraved indifference murder with regard to the same victim.  Dkt. No. 16-1 at 24.  Rather, on appeal, Petitioner attacked the evidence supporting his convictions for second degree murder and second degree attempted murder arguing that the evidence did not establish that he intended to kill Rush or West.  *Id*. at 24-25.

"In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and legal premises of the claim he asserts in federal court."  *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982).  A claim may be fairly presented to the state court if the "legal basis" of the claim in state court was the

19

"substantial equivalent" of the habeas claim. *Id*. at 192. The nature or presentation of the claim must have been likely to alert the state court to its federal nature. *Id.* If "material" factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim. *Id.*

Petitioner raised a challenge to the legal sufficiency of the evidence to support the conviction for murder and attempted murder. The Appellate Division concluded, "his conviction on the murder and attempted murder counts is supported by legally sufficient evidence." *Davis*, 155 N.Y.S. 3d at 516. Even assuming that the argument presented in this petition is slightly different than the claim made on direct appeal, in an abundance of caution, this claim will be addressed on the merits.

### 2. Merits

Petitioner's claim is subject to denial because it is meritless. The constitutional standard for challenges to the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) ("A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."). In making this determination, "pieces of evidence must be viewed not in isolation but in conjunction." *U.S. v. Brown*, 776 F.2d 397, 403 (2d Cir. 1985) (quoting *U.S. v. Geaney*, 417 F.2d 1116, 1121 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028 (1970)).

Additionally, "the reviewing court must draw all reasonable inferences and resolve all issues of credibility in favor of the verdict." *U.S. v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989) (citation omitted); *see also Cavazos*, 565 U.S. at 2 ("[I]t is the responsibility of the jury – not the

20

court – to decide what conclusions should be drawn from evidence admitted at trial.").  There-fore, "we must credit every inference that could have been drawn in the government's favor[.]" *U.S. v. Villegas*, 899 F.2d 1324, 1339 (2d Cir. 1990) (citation omitted); *see also Lane v. Graham,* No. 9:14-CV-01261 (JKS), 2016 WL 154111, at *8 (N.D.N.Y. Jan. 12, 2016) ("Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.") (citing *Schlup v. Delo*, 513 U.S. 298, 330 (1995)).

In sum, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that [state court appellate] judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  *Cavazos*, 565 U.S. at 2.  Furthermore, given that a federal habeas claim receives a second level of deference, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court . . . instead . . . the state court decision [must be] 'objectively unreasonable.' " *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

While "federal courts must look to state law for the substantive elements of the criminal offense . . . the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  *Coleman*, 566 U.S. at 655 (citations omitted).  Juries are given "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts."  *Id*. (internal quotation marks and citations omitted).

Petitioner argues there is "insufficient evidence to establish the requisite mens rea for both counts alleging mens rea towards one victim."  Pet. Memo. at 13.  Petitioner contends that

21

"the depraved indifference attempted murder conviction cannot stand together with the intentional murder conviction since Kiwan Rush is named as a victim in both counts." Pet. at 8.

As an initial matter, Petitioner seemingly misunderstands and misinterprets the jury verdict. Petitioner mistakenly contends that he was convicted of the murder and attempted murder of Rush (*see* Dkt. No. 1-1 at 14) when, in fact, he was convicted of second degree murder related to Rush and attempted murder related to West. Dkt. No. 17-4 at 368.

The two charges, requiring both an intentional and a reckless state of mind, arose from the same incident but related to different victims. Thus, Petitioner's argument, *i.e.*, that he cannot be found guilty of intentional and reckless conduct arising out of his acts with respect to a single victim, is inapplicable to this matter. *See Lozada v. Brown*, No. 10CV3222, 2014 WL 6845192, at *18 (S.D.N.Y. Dec. 4, 2014), *report and recommendation adopted*, 2016 WL 715785 (S.D.N.Y. Feb. 19, 2016).

The record confirms there was sufficient evidence presented for the jury to conclude that Petitioner acted intentionally and with depraved indifference. West testified that Petitioner was "shooting" from "May and Eastman" and "everyone ran." Dkt. No. 17-6 at 731. Petitioner and West exchanged gun fire and Petitioner got into a car and started shooting with "bullets hitting the ground." *Id*. at 733-735. Thus, there was sufficient evidence for the jury to determine that, after shooting Rush, Petitioner fled and, in the process, continued to shoot "with recklessness." *See Hamilton v. Supt., E. New York Corr. Facility*, No. 11CV1332, 2015 WL 13306815, at *20 (S.D.N.Y. Sept. 10, 2015) (noting that, given the testimony that the corner where the shooting occurred was crowded, the circumstances of the shooting evinced a depraved indifference to human life), *report and recommendation adopted,* 2017 WL 1944114 (S.D.N.Y. May 9, 2017). In other words, the jury could have found that Davis intended to harm Rush, "and, in the course

22

of doing so, recklessly endangered the lives of others around him[.]" *See Lozada,* 2014 WL 6845192, at *18. Accordingly, Ground 1 is denied and dismissed.

### B. *Brady* Violations (Ground 2)

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999).

*Brady* is not violated "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id*. at 281. Moreover, "*Brady* cannot be violated if the defendant[ ] had actual knowledge of the relevant information or if the documents are part of public records and 'defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.' " *U.S. v. Zagari*, 111 F.3d 307, 320 (2d Cir.1997) (quoting *U.S. v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995) (further citations and internal quotation marks omitted)).

### 1. Benefits to West

Petitioner claims, as he did in his § 330.30 motion, his § 440.10 motion, and his brief on direct appeal to the Appellate Division, that the prosecution failed to disclose information concerning an agreement to provide relocation expenses for West and his mother. Pet. Memo. at 15. Davis claims that the information is material since there is a reasonable probability the jury would have reached a different verdict had it been advised of the financial benefit West

23

received. *Id*. at 16.  In response, the People concede that relocation was discussed with West's mother, and despite his mother's request to relocate, West refused to relocate.  Resp. Memo. at 29.  Therefore, Respondent contends that no such agreement existed.  *Id.*  Respondent also argues that the state court properly decided that the information was not *Brady* material.  *Id*.

In the § 330 motion, Petitioner argued that West entered into an agreement with the prosecution for transportation fees/or travel tickets in exchange for testimony.  Dkt. No. 17-1 at 116.  The county court concluded that the information was not *Brady* material.  *Id.* at 150. Petitioner reiterated this argument in his §440 motion.  Dkt. No. 17 at 5-69.  The county court denied Petitioner's motion noting that the claim was "previously raised in [. . . ] [the] CPL § 330.30 motion and addressed by the Court on the record prior to sentencing[.]  As these claims were already adjudicated by this Court, denial of the motion on these grounds is proper under CPL § 440.10(3)(b)."  Dkt. No. 17-1 at 205.  On direct appeal, Petitioner restated the argument. Dkt. No. 17-4 at 494.  The Fourth Department did not specifically address the argument but noted, "[d]efendant's remaining contentions do not warrant reversal or modification of the judgment."  *Davis*, 155 N.Y.S.3d at 516.

Henry E. Brown ("Brown"), an investigator for the Onondaga County Attorney's Office provided an affidavit in support of the People's opposition to Petitioner's § 330 motion.  Dkt. No. 17-1 at 105.  Brown stated that, a "few days" before West testified, his mother contacted Brown to inform him that West was receiving "death threats from people acting on behalf" of Davis.  *Id*. at 105-106.  West's mother asked to be relocated after her son's testimony to "ensure his safety."  *Id*. at 106.  Brown made arrangements for West to travel to another state after his testimony, with funds provided by the District Attorney's Office.  *Id.*  However, West advised

24

Brown that he was not going to leave the state after his testimony.  Dkt. No. 17-1 at 106.  Brown averred:

> Tyron West said that he would testify truthfully. Also, he said he was not going to leave the state after his testimony. He told me, in the presence of ADA Matthew Doran, that he did not want to leave Syracuse. He said he was not going to leave. Prior to his testimony, Mr. West indicated that he did not believe he had to travel out of state.  Mr. West viewed having to leave the area as punishment. Mr. West maintained that he would testify as part of the agreement his lawyer made with the DA's Office, but he said that he would not take the flight out of state. However, he ultimately agreed to do so after his testimony.

Dkt. No. 17-1 at 106.

Upon review of the record, the Court finds that facts related to the "attempted relocation assistance" were not favorable because no actual benefit was provided to West and West was willing to testify without the assistance.  *See Arroyo v. Eckert*, No. 18 CV 5819, 2020 WL 3884892, at *10 (S.D.N.Y. May 28, 2020) (finding no *Brady* violation related to efforts to relocate because the witness was not relocated and testified willingly).

Moreover, the information was not material as it would not have impacted the jury's verdict. "[T]he Second Circuit has held that '[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial.' " *Arroyo*, 2020 WL 3884892, at *10 (quoting *U.S. v. Jackson*, 695 Fed. App'x 605, 607 (2d Cir. 2017)).

West was subjected to extensive challenges to his credibility.  On cross-examination, West testified that, on October 6, 2010, he was "on the run from the police because [he] had an outstanding warrant" for violation of probation on a robbery charge and pending gun

charges. Dkt. No. 17-6 at 747-748. West testified that he spent the day "gambling" and "getting high" on PCP and marijuana. *Id*. at 749-751. West testified that he was "walking around high" and "carrying a shotgun." *Id*. at 755. West described himself as "trigger happy." *Id*. at 758. West testified that he repeatedly lied to police, under oath, and told them Rush had the shotgun and that it was Rush who shot at the house. Dkt. No. 17-6 at 758-761. West testified that, as a result of his cooperation, he was not charged with possessing a loaded gun in June 2020 or with possessing a weapon in October 2010 or with shooting into a house full of people. *Id*. at 775.

Thus, West's credibility was "thoroughly attacked in multiple ways." See *Arroyo*, 2020 WL 3884892, at *10. The Court also notes that the jury was presented with "other evidence supporting the verdict" including J. Jones testimony. To wit, J. Jones identified Petitioner as the shooter. Dkt. No. 17-7 at 91-92. Further, if Petitioner's counsel utilized information related to relocation assistance during cross-examination, counsel would "open the door" to testimony that West's mother sought relocation due to threats made to her son. *See Ramirez v. Keyser*, No. 20-CV-8445, 2024 WL 1076945, at *7–8 (S.D.N.Y. Mar. 12, 2024) (noting that the undisclosed information was not material because defense counsel ably impeached witness's credibility on cross-examination by introducing prior inconsistent statements, and witness's recent conviction, and other evidence supporting verdict was strong) *appeal dismissed*, 2024 WL 5515399 (2d Cir. Sept. 19, 2024).

In sum, the state court's rejection of Petitioner's claim in this regard was neither contrary to, nor an unreasonable application of, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §§ 2254(d)(1), (2). This claim will therefore be denied and dismissed.

26

### 2. Recovery of Murder Weapon

Petitioner claims that the prosecution violated *Brady* when it failed to disclose that Dixie was arrested on January 26, 2011, three months after Davis's arrest, but prior to trial, for possession of a gun, which was later determined to be the murder weapon used in this case.  Pet. at 9; Pet. Memo. at 16-18.  Respondent argues that the claim is unexhausted because Petitioner did not argue, in the context of the § 440 motion, that this evidence was *Brady* material.  Resp. Memo. at 30-34.  Rather, Petitioner argued that the evidence constituted "newly discovered evidence."  *Id.*  Respondent also contends that the claim is meritless because the People did not know, at the time of trial, that the gun was the weapon used to murder Rush.  *Id*.

As noted *supra*, "[i]n order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and legal premises of the claim he asserts in federal court."  *Daye*, 696 F.2d at 191.  In the § 440 motion, Petitioner argued that evidence of Dixie's arrest, if received at trial, would have been favorable to the defense.  Dkt. No. 17 at 9.  In the order resolving the motion, the court discussed the issue of whether the information was exculpatory:

> As to the recovery of the murder weapon a few weeks after the defendant's arrest, the Court fails to see how that information is anyway exculpatory. The People did not offer any weapon into evidence at trial against the defendant and were not aware themselves that forensic examination and testing several months later upon a weapon from an unrelated case would result in a match to the gun that was used to fatally shoot Kiwan Rush. Aside from not being exculpatory of the defendant, the weapon simply does not meet the definition of newly discovered evidence as defined by CPL §440.l0(l)(g).

Dkt. No. 17-1 at 203-205.

The Court agrees that this *Brady* claim is unexhausted.  *See Brown v. Comm'r, Dep't of Corr.*, No. 3:21-CV-0752, 2022 WL 3027918, at *7, n. 4 (D. Conn. Aug. 1, 2022) (noting that

27

the *Brady* claim was unexhausted as the petitioner argued only that the trial court erred in concluding that the newly discovered evidence would not produce a different result, and did not explicitly challenge the *Brady* issue).  However, under the AEDPA, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2); *see also Turner v. Artuz*, 262 F.3d 118, 122 (2d Cir. 2001) ("Under AEDPA, . . . [a] district court . . . now has the option of denying mixed petitions on the merits.").

In this matter, the unexhausted claim is meritless.  Therefore, "[i]t would therefore serve little purpose to require [P]etitioner to present th[is] claim[] in state court before returning here." *See Berger v. Stinson*, 97 F.Supp.2d 359, 369 (W.D.N.Y. 2000) (finding it unnecessary to reach the exhaustion issue, as "it is obvious, based on established law and a relatively quick reading of the record, that the claim does not raise any issue upon which a habeas court may grant relief.")

Petitioner was convicted on May 25, 2012.  The parties agree that results of forensic testing on the gun recovered from Dixie were not revealed to the prosecutor until February 2013, eight months after Davis was convicted.  *See* Dkt. No. 17 at 93.  Thus, these results "simply do[] not constitute *Brady* material" and Petitioner has submitted no authority for the proposition that a prosecutor has a duty to turn over evidence that does not yet exist.[7]  *See Castillo v. U.S.*, No. 92 Civ. 3982, 1993 WL 51181 *8 (S.D.N.Y. Feb.23, 1993) (evidence that did not exist until after trial did not implicate *Brady*, but rather was "newly discovered evidence" for purposes of § 2255 motion); *see Berger*, 97 F.Supp.2d at 367 (noting that information on

---

[7] To the extent that the forensic information may constitute "new evidence," that is discussed *infra*.

28

criminal proceedings in Florida, discovered three months after conviction, was not *Brady* material).

To the extent that Petitioner alleges that information related to Dixie's January 26, 2011 arrest and the investigation into that matter constituted *Brady* material, that claim is also without merit. At the time Dixie was arrested, he was found to be in possession of a "semiautomatic handgun." Dkt. No. 17 at 130. However, at the time of trial, there was no "identifiable connection" between the gun used to kill Rush was the gun that was found in Dixie's possession in 2011. *See Ward v. Herbert*, 509 F.Supp.2d 253, 263 (W.D.N.Y. 2007) (noting that "[t]he admission of evidence of third-party culpability may not rest on mere suspicion or surmise.").

Moreover, Petitioner presents no evidence to suggest that Court should "impute the knowledge of other state and government agencies" in investigations involving individuals wholly unrelated to the incidents herein, to the prosecutors in this matter. *See Gonzalez-Pena v. Herbert*, 369 F.Supp.2d 376, 389 (W.D.N.Y. 2005) (noting that the Second Circuit has not required prosecutors to learn of evidence possessed by other agencies that are not involved in the investigation of the particular defendants).

The fact that Dixie was arrested with a gun that later was determined to have been used to kill Rush "would not necessarily exonerate" Petitioner because "guns are often passed between perpetrators." *Id.*; *see also U.S. ex rel. Johnson v. Chambers*, No. 05 C 2475, 2006 WL 2644956, at *5 (N.D. Ill. Sept. 14, 2006) (noting that the recovery of the murder weapon after conviction does not prove that the petitioner did not fire the gun on the date in question).

Indeed, the jury was presented with evidence that Petitioner fled the scene of the shooting. Dkt. No. 17-6 at 732-733. Further, the People did not offer any weapon into evidence at trial. Dkt. No. 17-1 at 203; *see Philbert v. Brown*, No. 1:11-CV-1805, 2012 WL 4849011, at *9

29

(E.D.N.Y. Oct. 11, 2012) (noting that an investigation and ballistics report related to an arrest and weapon were not material without a "reasonable probability that the result of the proceeding would have been different").

Because Petitioner has failed to allege that the evidence at issue was favorable to his case or prejudice to his case resulted from the failure to disclose information related to the arrest or investigation, Petitioner has not demonstrated that this evidence was material to his guilt or punishment, and his *Brady* claim fails on its merits.  Accordingly, Ground 2 is denied and dismissed.

### C.  New Evidence (Ground 3)

Petitioner claims that the following newly discovered evidence "casts [ ] doubt on Mr. Davis' guilt": (1) the results of forensic testing on Dixie's weapon; (2) S. Jones' gang affiliation and involvement with theft of guns; and (3) Everson's affidavit.  Pet. at 9; Pet. Memo. at 16-23.  Respondent argues that the claims lack merit.  Resp. Memo. at 34-38.

"A claim based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (internal quotation marks and citations omitted).  "Federal habeas relief is available on grounds of newly discovered evidence only if the new evidence discovered bears on constitutionality of petitioner's detention."  *Smithwick v. Walker*, 758 F.Supp. 178, 184 (S.D.N.Y.) (citation omitted), *aff'd*, 948 F.2d 1278 (2d Cir. 1991).  "Evidence which goes only to the guilt or innocence of petitioner is not sufficient to require habeas corpus relief."  *Id*. (citations omitted); *see also Dickerson v. Conway*, No. 08 CIV. 8024, 2013 WL 541508, at *22–23 (S.D.N.Y. Feb. 14, 2013) (the existence of "evidence relevant to the guilt of a state prisoner is not a ground for relief on

30

federal habeas corpus") (citations omitted), *report and recommendation adopted*, 2013 WL 3199094 (S.D.N.Y. June 25, 2013).

In order for a new trial to be granted based on newly discovered evidence, petitioner must show that "the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." *U.S. v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980) (citations omitted); Fed. R. Crim .P. 33. "This principle presupposes . . . that the proffered new 'evidence' would be admissible at the new trial." *U.S. v. Parker*, 903 F.2d 91, 103 (2d Cir.1990).

In determining whether to grant a new trial, the district court must exercise great caution "and may grant the motion only 'in the most extraordinary circumstances.' " *U.S. v. Gordils*, 982 F.2d 64, 72 (2d Cir.1992) (quoting *U.S. v. Fassoulis*, 203 F.Supp. 114, 117 (S.D.N.Y. 1962)); *see also U.S. v. Imran*, 964 F.2d 1313 (2d Cir.1992), *cert. denied*, 506 U.S. 1009 (1992); *U.S. v. Stofsky*, 527 F.2d 237, 242 (2d Cir.1975). Thus, evidence that would merely impeach a witness may not be sufficient to warrant a new trial.

Petitioner raised these claims in his § 440.10 motion to vacate his conviction. Petitioner argued that had evidence "of the recovery of the murder weapon" been presented during trial, "it is without question that the outcome would have been different." Dkt. No. 17 at 61. Petitioner also argued that evidence of S. Jones' gang affiliation and Everson's affidavit would have impacted the credibility of witnesses. *Id*. at 62-64.

In rejecting these claims, the § 440 court determined:

> The People did not offer any weapon into evidence at trial against the defendant and were not aware themselves that forensic examination and testing several months later upon a weapon from an unrelated case would result in a match to the gun that was used to fatally shoot Kiwan Rush. Aside from not being exculpatory of the

31

defendant, the weapon simply does not meet the definition of newly discovered evidence as defined by CPL §440.l0(l)(g).

Similarly, the alleged gang affiliation of prosecution witness Sherron Jones, does not constitute newly discovered evidence. Foremost, this very issue was raised in attorney Bianco's CPL §330.30 motion and denied by the trial court. As such, the Court may deny the defendant's motion pursuant to CPL §440.10(3)(b). Likewise, as this issue is clearly preserved in the record of this case, denial of the motion on this ground is required by CPL §440.10(2)(c) as the defendant has not perfected his direct appeal.

Lastly, the defendant asks the Court to deem the December 12, 2017 affidavit of Shawndell Everson newly discovered evidence and to serve as a basis for granting him a new trial. Notably, this affidavit consists entirely of hearsay and therefore does not provide "sworn allegations substantiating or tending to substantiate all of the essential facts" as required by CPL §440.30[4][b]. Despite this procedural flaw, the Court does not find the affidavit of Everson compelling to the point of requiring a new trial, let alone an evidentiary hearing. Most obviously, the affidavit claims that Jaquin Gilbert recanted his identification of the defendant as the shooter; something that Jaquin Gilbert never testified to at trial. Rather, Gilbert testified at trial that he did not recall any details about the shooting and could not identify the defendant as the shooter. He was excused without cross-examination. His trial testimony did not in any way implicate the defendant as the killer of Kiwan Rush and the Court does not feel that his supposed recantation would likely change the verdict in the defendant's favor if a new trial were granted.

As with the alleged recantation of Tyron West, any supposed recantation of Jaquin Gilbert, is of the least reliable form of evidence for a court to consider. As has been repeatedly expressed by many courts, "recantation evidence is inherently unreliable and is insufficient alone to require setting aside a conviction" (*People v. Baxley*, 194 AD2d 681, 682 *modified* 84 NY2d 208).

Dkt. No. 17-1 at 203-204.

Petitioner does not cite to any independent constitutional error and has not explicitly alleged that his continued incarceration would deprive him of any specific federal constitutional right. Instead, Petitioner claims that the newly discovered evidence "show[s] actual innocence"

32

and "casts further doubt" on his guilt. This is not grounds for habeas relief. *Williams v. Duncan*, No. 9:03CV568 (LEK/RFT), 2007 WL 2177075, at *17 (N.D.N.Y. July 27, 2007).

Even assuming Petitioner had cited to a constitutional violation, relief is not warranted for the following reasons.

First, with respect to the recovery of the weapon, this evidence is unlikely to have impacted the jury verdict. As noted *supra*, the People did not present evidence related to the murder weapon at trial. *See Araujo v. Chandler*, 435 F.3d 678, 682 (7th Cir. 2005) (rejecting "new evidence claim" because the prosecution did not positively match the gun found in the petitioner's home to a bullet that was recovered from the victim). Moreover, the recovery of the weapon "at a later date," does not establish that Petitioner did not fire the weapon on October 6, 2010. *See Johnson* 2006 WL 2644956, at *5 (N.D. Ill. Sept. 14, 2006).

Second, while Petitioner contends that "evidence" of S. Jones' gang affiliations and involvement with stolen firearms and ammunition became known "after trial," *see* Dkt. No. 1-1 at 20, Petitioner does not explain what this "evidence" is or when he discovered the evidence. In support of the § 440 motion, counsel annexed a copy of a newspaper article, dated July 2012, related to a shooting involving S. Jones. Dkt. No. 17-4 at 403-404. In the article, an attorney told the press that his client believed S. Jones was a "member[] of a street gang." *Id.*

While the petition lacks any reference to this newspaper article, assuming this is the "evidence" proffered by Petitioner, the statement is hearsay and inadmissible at trial, "much less evidence going to petitioner's innocence." *See Israel v. New York*, No. 16 CV 8541, 2020 WL 3643046, at *21 (S.D.N.Y. Feb. 4, 2020), *report and recommendation adopted,* 2020 WL 3640012 (S.D.N.Y. July 6, 2020). Moreover, Petitioner has not presented any argument that would allow the Court to conclude that this "evidence" was material or that the admission of the

33

evidence would have led to an acquittal.  *See Alvarez v. Kirkpatrick*, No. 15 CIV 8076, 2019 WL 2425181, at *13 (S.D.N.Y. Mar. 1, 2019) (holding that evidence of the prosecution witnesses' gang affiliations does not meet the standard for newly discovered evidence), *report and recommendation adopted,* 2019 WL 2419412 (S.D.N.Y. June 10, 2019).

Finally, with respect to Petitioner's argument that Everson's affidavit provides "independent corroboration that the fatal shooting was the result of [ ] gang involvement," the Court disagrees.  As noted by the trial court, Gilbert did not identify Petitioner at trial.  Thus, Everson's proposed testimony could not be used to impeach Gilbert or attack his credibility.  *See Smithwick*, 758 F.Supp. at 184 (holding that even if the testimony of a jailhouse informant was true, it pertains to the question of the petitioner's guilt or innocence, and not the constitutionality of his detention and is relevant to credibility only); *see also Williams*, 2007 WL 2177075, at *18 (noting that the hearsay account would not have impacted the jury's view of the witness' credibility or led to the petitioner's acquittal).

Any testimony from Everson would not "raise reasonable doubt sufficient to avoid a conviction."  *See Eyck v. Lee*, No. 19 CV 6924L, 2020 WL 8671942, at *15 (S.D.N.Y. Oct. 9, 2020) (citing *Balkman v. Poole*, 725 F.Supp.2d 370, 377 (W.D.N.Y. 2010) (newly discovered evidence consisting of testimony from a jailhouse informant purporting to relate a confession by a fellow inmate was not grounds for a new trial where the informant was "inherently lacking in credibility" and thus would not have changed the outcome)), *report and recommendation adopted*, 2023 WL 5917564 (S.D.N.Y. Sept. 11, 2023).  Accordingly, Ground 3 is denied and dismissed.

### D. Sentence (Ground 4)

Petitioner claims that the trial court imposed a sentence greater than that offered in plea negotiations because he exercised his right to trial.  Pet. Memo. at 26.  Petitioner also asserts

34

that the trial court unlawfully imposed consecutive sentences for murder and attempted murder in violation of Penal Law § 70.25(2). *Id*. at 29. Third, Petitioner claims that his sentenced constituted cruel and unusual punishment. *Id*. at 29; Pet. at 10. Respondent avers that Petitioner's claims are not subject to habeas review and that the Appellate Division's rejection of Petitioner's claim in this regard was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Resp. Memo. at 46-51.

### 1. Vindictive Sentencing

Petitioner argues, as he did in the state court, that the sentence of 50 years to life was imposed for punishment for exercising his right to trial. Pet. Memo. at 25-26. However, the trial court observed:

> Upon review of the trial record, it is clear that many witnesses were giving the prosecution difficulty and there was even an identification hearing conducted mid-trial. It would have been reasonable, at that juncture, for the Court to believe the People's case was not so strong and make an offer to reasonably resolve the case. ·However, later the People were able to meet their burden and Defendant was convicted of all but one count by the jury. After having heard all of the ·evidence in the case, which involved a murder and attempted murder, and after the People having met their burden it is more than reasonable for the trial court at that point to sentence the Defendant to the maximum sentence on several counts. The maximum sentence after a jury trial in a case of this kind can in no way be seen as vindictive.

Dkt. No. 17-4 at 628-629.

The Supreme Court has determined that due process is violated when a penalty is imposed upon a person who elects to exercise a constitutionally protected right, including the right to have a jury trial in a criminal case. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

35

"However, the mere fact that the sentence imposed following trial is greater than the offer made during plea negotiations, does not indicate that a petitioner has been punished for exercising his right to proceed to trial." *Walker v. Walker*, 259 F.Supp.2d 221, 226 (E.D.N.Y. 2003) (citing *U.S. v. Araugo*, 539 F.2d 287, 292 (2d Cir. 1976)); *see also Lane v. Graham*, No. 09:14-CV-1261 (JKS), 2016 WL 154111, at *13 (N.D.N.Y. Jan. 12, 2016) (holding that the difference between the 17-year plea offer rejected by petitioner prior to trial and the 50-year maximum sentence ultimately imposed did not, by itself, suggest vindictiveness by the trial court); *Naranjo v. Filion*, No. 1:02-CV-5449, 2003 WL 1900867, at *9-10 (S.D.N.Y. Apr. 16, 2003) (finding the disparity between the prosecution's pretrial plea offer of 5 to 10 years and his subsequent sentence of 25 to 50 years did not suggest vindictiveness). Regardless of what was offered to a petitioner during his plea deal, a petitioner's sentence is only unconstitutional if it falls outside the range prescribed by state law. *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir. 1992).

Although Petitioner ultimately received a sentence longer than the plea deal he rejected, Petitioner has not pointed to any proof in the record suggesting that vindictiveness or other improper criterion influenced the trial court's decision when sentencing Petitioner. Accordingly, Petitioner cannot prevail on this sentencing claim. Therefore, the lower court's conclusion was not contrary to Supreme Court law nor an unreasonable interpretation of the facts. Thus, habeas relief, on this ground, is not warranted.

### 2. Consecutive Sentences

Petitioner also argues that the court should have imposed concurrent sentences for the counts of murder and attempted murder. The Appellate Division rejected this argument,

holding that "the imposition of consecutive terms of imprisonment on the murder and attempted murder counts was not illegal." *Davis*, 198 A.D.3d at 1356.

Petitioner's argument that the sentencing court erred in imposing consecutive sentences is not cognizable on federal habeas review. *See United States v. McLean*, 287 F.3d 127, 136 (2d Cir. 2002) ("[T]here is no constitutionally cognizable right to concurrent, rather than consecutive, sentences") (internal quotation marks omitted); *Goad v. Bell,* No. 9:19-CV-0965 (MAD/DJS), 2020 WL 13910650, at *2 (N.D.N.Y. Jan. 23, 2020) (citing *Blume v. Martuscello*, No. 1:13-CV-4310, 2016 WL 1070847, at *13 (S.D.N.Y. Mar. 15, 2016) (noting that "[w]hether the sentencing court properly applied . . . Penal Law § 70.25 in determining that [petitioner's] sentences were consecutive rather than concurrent is not cognizable on federal habeas review."). "Thus, there was no error of New York state law, much less an error of federal constitutional magnitude." *Evans v. Colvin*, No. 9:16-CV-01346 (JKS), 2018 WL 3069211, at *5 (N.D.N.Y. June 21, 2018).

### 3.  Harsh and Excessive

It is well settled that an excessive sentence claim may not be raised as grounds for federal habeas corpus relief if the sentence imposed was within the range prescribed by state law. *White*, 969 F.2d at 1383; *Bellavia v. Fogg*, 613 F.2d 369, 373 (2d Cir. 1979) (setting mandatory sentences is solely the province of state legislature); *Lane,* 2016 WL 154111, at *13 (holding that an excessive sentence claim does not present a federal question cognizable on habeas review where the petitioner does not dispute the sentence was within the range prescribed by law). The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction. *Lockyer v. Andrade,* 538 U.S. 63, 72-73 (2003);

*accord, Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *Rummel v. Estelle*, 445 U.S. 263, 271 (1980).

A sentence that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense. *See White*, 969 F.2d at 1383; *accord, Todd v. Supt.*, No. 9:08-CV-1209 (NAM), 2009 WL 5216944, at *7 (N.D.N.Y. Dec. 30, 2009) ("A sentence of imprisonment which is within the limits of a valid state statute is simply not cruel and unusual punishment in the constitutional sense.").

Petitioner does not dispute that his sentence fell within the state's statutory guidelines, and therefore, his harsh and excessive sentence claim or claim that the sentence violated the Eighth Amendment is not cognizable on federal habeas review. *See White*, 969 F.2d at 1383; *Lane*, 2016 WL 154111, at *13. Accordingly, Ground 4 is denied and dismissed.

### E. Ineffective Assistance of Counsel (Ground 5)

Petitioner claims his trial counsel was ineffective because she: (1) failed to investigate the background of teenage witnesses and their involvement with "a neighborhood gang"; and (2) failed to impeach West. Pet. at 10-11; Pet. Memo. at 33-39. Respondent contends that Petitioner's arguments were rejected by the trial court. Resp. Memo at 35.

To succeed on a claim of ineffective assistance of counsel, a defendant must prove both that: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish that counsel's performance was deficient, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' " *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). To demonstrate counsel's deficient performance prejudiced his defense, "a defendant must 'show that there is a

38

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro,* 550 U.S. at 473) (internal quotations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

Petitioner raised the issues before this Court in his § 440.10 motion. The trial court rejected these claims holding:

> With regard to the claim that Bianco was ineffective because she did not either properly cross-examine Tyrone West with the content of the March 1, 2012, letter wherein he purportedly denied seeing the defendant shoot Kiwan Rush, or by failing to enter the letter into evidence, the Court does not agree. Foremost, it should be noted that defense counsel did, in fact, attempt to cross examine Tyrone West with the content of the letter. Tyrone West denied writing the letter, leaving defense counsel with little ability to attribute the content of the letter to the witness. As to the effect that this denial had upon the credibility of Tyrone West as a witness, that was a determination that laid solely in the province of the jury. The jury was free to give the denial whatever weight they felt it deserved in assessing the credibility of Tyrone West.
>
> Similarly, defense counsel's failure to seek to admit the letter into

39

evidence did not constitute ineffective assistance of counsel. Rather, it was a decision made in consultation with the defendant, with the specific strategy of preventing the jury from hearing about the defendant's prior felony convictions. In order to potentially lay a sufficient foundation for the introduction of the letter, it would have been necessary to call the defendant as a witness. The court had previously made a reasonable *Sandoval* ruling that should the defendant elect to testify, the prosecutor would be able to ask him if he had two prior felony convictions. As part of the strategic decision to prevent the jury from learning of the defendant's prior convictions, attorney Bianco advised the defendant against testifying. The defendant previously acknowledged that he was consulted on this decision and agreed that it was not in his interest to testify. Furthermore, based upon a review of all of the submissions and the trial record as a whole, the Court agrees with the People that West's purported recantation is "totally unreliable" and cannot serve as the basis for vacating the defendant's conviction, nor justify the need for an evidentiary hearing (*See People v. Cintron*, 306 AD2d at 152; *People v. Lane*, 100 AD3d at 1540-1541).

The defendant also alleges that his trial attorney failed to follow-up on various investigative leads that he provided to her. Specifically, the defendant claims that Ms. Bianco failed to sufficiently investigate alleged gang ties of prosecution witness Sherron Jones. Sherron Jones sustained a gunshot wound during the course of the trial, shortly after he had testified against the defendant. Notably, this issue was raised by attorney Bianco in her CPL §330.30 motion filed July 10, 2012. In rejecting the claim, the Court ruled that this did not constitute newly discovered evidence. In light of the speculative nature as to Sherron Jones alleged gang affiliation, it cannot be said that if such evidence had been admitted during the course of the trial, that it would have likely resulted in a different outcome. Accordingly, trial counsel was not ineffective for seeking to introduce it during the course of the trial.

Dkt. No. 17-1 at 198-200.

Notably, this Court must view the state court decision through a doubly deferential lens.

*See generally Cullen*, 563 U.S. at 190.

## 1.  Failure to Investigate

Petitioner argues that counsel failed to conduct any investigation into the background of the teenage witnesses, including possible gang associations, which would have revealed a

possible motive for the shooting and undermine the witness' credibility.   Pet. Memo. at 36. Petitioner also contends that counsel failed to investigate a shooting that took place the day after Sherron Jones testified.  *Id.* at 37.  Respondent avers that Petitioner's claims are purely speculative.  Dkt. No. 16-1 at 44.

"To assert an ineffective assistance of counsel claim based on a failure to investigate, Petitioner 'must do more than make vague, conclusory, or speculative claims as to what evidence could have been precluded by further investigation.' "  *Simpson v. Melecio*, 2022 WL 19296994, at *8 (N.D.N.Y. June 13, 2022), *report and recommendation adopted*, 2023 WL 2665463 (N.D.N.Y. Mar. 28, 2023) (quoting *Ortiz v. Heath*, 2011 WL 1331509, at *11 (E.D.N.Y. Apr. 6, 2011)).

Based upon the record, the Court concludes that Petitioner's counsel representation was not deficient.  Counsel zealously investigated factual matters presented throughout trial and post-conviction.  Indeed, during oral argument in support of the §330 motion, counsel advised the trial court that, post-conviction, she forwarded the March 2012 letter to a forensic handwriting expert for analysis.  Dkt. No. 17-1 at 154.

While Petitioner argued in his § 440.10 motion that an investigation into the "gang ties of the teenagers" would "have potentially" produced evidence to undermine their "questionable testimony," Petitioner has offered nothing more than speculation.  Petitioner has not supplied any evidence, or even explained what evidence he believes should have been investigated or uncovered.  His contentions regarding "gang associations" are wholly conclusory and "fall short of stating a valid claim." *See Watson v. New York*, No. 07 CIV. 1111, 2011 WL 4639812, at *3 (S.D.N.Y. Oct. 6, 2011) (finding that the petitioner failed to prove that trial counsel failed to "wholly investigate" but, instead "made strategic decisions regarding how best to challenge the

41

People's case"); *see also Gales v. Kernan*, No. CV 16-2406, 2017 WL 1377737, at *15 (C.D. Cal. Mar. 7, 2017) (denying habeas relief based upon a speculative claim that defense counsel failed to investigate co-defendant's background and obtain documents, such as jail records, to impeach a witness by demonstrating his gang affiliation), *report and recommendation adopted*, 2017 WL 1399646 (C.D. Cal. Apr. 11, 2017).

Because Petitioner cannot establish that "but for errors" on the part of his counsel, the outcome of the trial would have been different, Petitioner has provided no basis for concluding that he received ineffective assistance of counsel during for failing to investigate.

### 2.  Failure to Impeach West

Petitioner contends that trial counsel provided ineffective assistance because "[s]he failed to properly use [a] recantation letter that would have cast great doubt" on West's trial testimony.  Pet. Memo. at 34.  Respondent argues the trial court's denial of Petitioner's ineffective assistance claim on this basis was not unreasonable.  Resp. Memo. at 41.

The Second Circuit has held that the decision "whether to engage in cross-examination, and if so, to what extent and in what manner" are strategic decisions that courts will almost never second guess.  *U.S. v. Nersesian*, 824 F.2d 1294, 321 (2d. Cir.1987), *cert. denied* 484 U.S. 958 (1987); *U.S. ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir.1974), *cert. denied* 417 U.S. 972 (1974).  "Courts are reluctant to find unreasonable conduct in defense counsel's cross-examination strategy absent grave error falling below the required professional standard." *Salcedo v. Artuz*, 107 F.Supp.2d 405, 417–18 (S.D.N.Y. 2000); *see also Wynn v. Lee*, No. 9:19-CV-0209 (BKS/CFH), 2022 WL 19405961, at *18 (N.D.N.Y. Dec. 12, 2022) ("cross examination is a trial strategy that is not intended to be second guessed by habeas

42

review.") (collecting cases), *report and recommendation adopted*, 2023 WL 2364875 (N.D.N.Y. Mar. 6, 2023).

Upon review, Petitioner cannot establish the first prong of the *Strickland* test: there is nothing in the record to support the conclusion that trial counsel's performance was objectively unreasonable. First, counsel elicited testimony from West related to the letter. On cross examination, West denied writing the letter on March 1, 2012. Dkt. No. 17-6 at 769-770. West testified that he was incarcerated at Lakie Cottage, located in Lincolndale, New York and that he used the nickname "Woody." *Id*. Petitioner's counsel presented West with a copy of an envelope and he stated it depicted his name, but it was not his handwriting. *Id*. Counsel asked, "[s]omebody else knew where you were, wrote your name, wrote the letter and set it off?" *Id*. West responded, "[a] lot of people knew where I was, yeah." Dkt. No. 17-6 at 770. Counsel then asked:

> Q. Okay. I'd like to show you your statement of October 29th, and I'd like you to take a look where you wrote Tyron West on the bottom, and compare it to the letter where Tyron West is written. Do you think they're remarkable similar?
> A. Um, not at all.
> Q. Not at all. Okay.
> A. No.

Dkt. No. 17-6 at 770.

Counsel also extensively cross-examined West and highlighted issues related to his credibility including his criminal record, his use of PCP cigarettes on the day of the shooting, and the fact that he was walking around carrying a shotgun on the day in question while admittedly, "trigger-happy." Dkt. No. 17-6 at 749-778. Counsel also elicited testimony from West that he "went and shot up Tommy Davis' house" and that he intentionally provided false statements to the police, under oath, on more than one occasion. *Id*. During cross-examination,

43

West was evasive and testified in a manner that contradicted prior statements forcing counsel to impeach the witness with prior signed statements. *Id.* A review of the West's trial testimony belies Petitioner's claim that counsel's advocacy was "deficient," in this regard. *See Rodriguez v. Smith*, No. 13-CV-2522, 2015 WL 4429333, at *2 (E.D.N.Y. July 20, 2015) (holding that, during the trial, petitioner's counsel engaged in an informed and effective cross-examination).

Moreover, counsel's decision to refrain from attempts to admit the letter into evidence was clearly the result of strategy. During oral argument in support of the § 330 motion, counsel read the contents of the letter into the record and explained to the trial court that she did not attempt to lay the "proper foundation" to admit the letter into evidence due to the court's ruling regarding Petitioner's felony convictions. As a result of that ruling, Petitioner made the decision not to testify . Dkt. No. 17-1 at 151-153.

Petitioner's disagreement with this strategy is not a basis for habeas relief. *See Porter v. McGinnis*, No. 9:03-CV-1299 (LEK/GJD), 2007 WL 2789466, at *14 (N.D.N.Y. Sept. 24, 2007). Even if Petitioner wishes that trial counsel had posed additional questioning regarding the letter, the Court cannot say that counsel pursued an unreasonable trial strategy. *Wynn v. Lee*, No. 9:19-CV-209 (BKS/CFH), 2023 WL 2364875, at *5 (N.D.N.Y. Mar. 6, 2023) (citations omitted). Petitioner's trial counsel did not fall below an objective standard of reasonable attorney conduct. Thus, Petitioner cannot satisfy the first prong of the *Strickland* test.

Even assuming Petitioner established that counsel's performance was deficient, Petitioner cannot show prejudice; i.e. "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694.

Based on the record, this Court cannot say that the state court's decision was unreasonable or contrary to clearly established Supreme Court precedent.  Accordingly, this ground for habeas relief is denied and dismissed.

### F.  Actual Innocence (Ground 6)

Petitioner claims he is actually innocent of the crimes for which he was convicted.  Pet. at 11.  Respondent avers that habeas relief cannot rest on a freestanding actual innocence claim.  Resp. Memo. at 35.

"Although the Second Circuit has also not ruled on whether a claim of actual innocence is cognizable on habeas review, it has 'come close' to granting habeas relief on grounds of actual innocence[.]" *Jones v. Annucci*, 124 F.Supp.3d 103, 124 (N.D.N.Y. 2015) (internal citations and citations omitted).  Even if this Court entertains Petitioner's argument, the threshold for prevailing on a freestanding innocence claim is "extraordinarily high." *Id*. (citing *Herrara v. Collins*, 506 U.S. 390, 417 (1993)).

Here, Petitioner vaguely states that he is actually innocent but does not present any substantive argument in support of a freestanding claim. *See* Pet. at 11.  Assuming Petitioner's "actual innocence" claim rests upon the "newly discovered evidence" discussed *supra*, that evidence does not meet the "extraordinarily high" standard set forth in *Herrara*.  "Petitioner's claim of actual innocence is not compelling as he fails to show that it is 'more likely than not that no reasonable juror would have convicted him.' " *Diaz v. Bellnier*, No. 08 CV 4009, 2012 WL 4447357, at *7 (E.D.N.Y. Sept. 24, 2012*), adhered to on denial of reconsideration*, 974 F.Supp 2d 136 (E.D.N.Y. 2013).

Petitioner has not presented any "new, reliable evidence, not presented at trial" to support his conclusory allegation that he is innocent of the crimes for which he was convicted. *See*

*Adsit v. Annucci*, No. 916CV00817GTSCFH, 2018 WL 1175090, at *6 (N.D.N.Y. Jan. 11, 2018), *report and recommendation adopted*, 2018 WL 1175212 (N.D.N.Y. Mar. 5, 2018).

This ground for habeas relief is therefore denied and dismissed.

## VI.   CONCLUSION

**Therefore**, it is

**ORDERED** that

1.  The Petition, Dkt. No. 1, is **DENIED AND DISMISSED** in its entirety; and

2.  The Court declines to issue a Certificate of Appealability ("COA").[8]

The Clerk is directed serve a copy of this Decision and Order on the parties in accordance with the Local Rules of Practice.

IT IS SO ORDERED.

Dated: May 15, 2026
     Utica, New York.

David N. Hurd
U.S. District Judge

---

[8]  28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' ") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003));

**EXHIBIT A**

To: Tommy Davis                    3/1/12

Ayo wats good? How you holding up.

Anywayz this woody/Tyron west. I wanted to let you know that nobody going to take the stand on you. Im trying to take the statment back I wrote on you. I waz 15 years old when that shit happen man. Keep it real guzz I waz swindle and pursaded to say you shot my boy kiwan. I waz told no charges would be press on me If I say I saw you shoot him. But to be Honest I don't know you man so this is wat it is. On Some real 'G' shit guzz I don't wanna see you get life so IMA do wat I can to get you out. the D-A Christine Garvey playing but shit like I said I don't know who killed my boy. I hope nothing but the best 4 you man. Tell ya lawyer wat I said and see wat's good. Because I'm writing you telling you I don't know you and never saw you. Give this letter to the DA, the Sugde, or who ever. worcha Face Im not Rating on you boo. Because I Dont Know who did it.

SR 1134

I Hope All Charges get Drop.

aqeah worda Rantwon niggaz telling me you put my statment in the hood? mann fuck all that shit guzz 1At the end of the day Im not polite. But shit write back If you could If you can't then I understand.

Love iz Love

Rest in peace kiwan Rush

we miss you!

Tyron West

Tyron west.

Keep ya head up.

329

Love

Love

Love

Love

12

SR 0136

SR137

Tyron west (falahee cottage)
P.O Box 100 Rte 202
Lincolndale, ny 10540



$00.48

Tommy DAVIS ~~3A4Q~~
~~#~~ (2 B 5 2)
~~555~~ State street (Justice center county)
Syracuse, ny 1320 1 2  Jail